**AVCO CORPORATION, Textron Lycoming Williamsport, et al., Appellants,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Appellee.**

No. 89–5033.

United States Court of Appeals, District of Columbia Circuit.

Argued May 23, 1989.

Decided Sept. 8, 1989.

Michael G. Scheininger, with whom Thomas C. Papson and T. Mark Flanagan, Washington, D.C., were on the brief, for appellants.

Robert L. Vogel, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Michael F. Hertz, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before SILBERMAN and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This is an appeal by Dr. Yoon Sam Kim ("Kim" or "appellant"), an employee of Avco Corporation, Textron Lycoming Division ("Avco"), from a final order of the United States District Court for the District of Columbia. That order denied a petition by Kim to set aside a civil investigative demand ("CID" or "demand") filed by the Attorney General under the False Claims Act, 31 U.S.C. §§ 3729–3733 (1982) ("the Act"), and granted a cross-petition to enforce the demand. Appellant contends that the District Court committed error in its construction of the authorizing statute. Finding no such error, we affirm.

## I. BACKGROUND

The False Claims Act is the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government. *See* S. REP. No. 345, 99th Cong., 2d Sess. 2 (1986), *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS 5266. Section 3729 of the Act delineates conduct giving rise to liability under the Act. Such conduct includes knowingly submitting false claims for payment, 31 U.S.C. § 3729(a)(1), and knowingly making or using a false record or statement to get a false claim paid or approved by the government, *id.* § 3729(a)(2). That section also provides for civil penalties as high as $10,000 plus three times the amount of damages sustained by the government. *Id.* § 3729(a).

■ Section 3730 of the Act provides a civil action for the recovery of liabilities under section 3729. Section 3730(a) provides that the Attorney General may bring a civil action against a person violating section 3729. Section 3730(b) provides for

"actions by private parties," commonly called *"qui tam"* proceedings. A 1986 amendment to the Act requires that a *qui tam* complaint be filed *in camera* and not be served on the defendant until the court so orders. This same amendment provides that a copy of the complaint "and written disclosure of substantially all material evidence and information the person [filing the case] possesses shall be served on the government." 31 U.S.C. § 3730(b)(2). The complaint is to remain under seal for sixty days, with extensions of that period by order of the court on motion of the government for good cause shown. *Id.* § 3730(b)(3). Before the expiration of the sixty-day period (or of any extensions obtained under subparagraph (3)), the government must either proceed with the action or notify the court that it declines to so proceed, in which case the original plaintiff has the right to conduct the action. *Id.* § 3730(b)(4)(A)—(B). Some time shortly before December 7, 1988, a private person brought such a *qui tam* action against Avco.[1] That complaint was properly filed *in camera* and remains under seal at the time of this appeal.

Another section of the Act, section 3733, added in 1986 as part of an extensive revision of the Act, empowers the Attorney General, "before commencing a civil proceeding under section 3730 or other false claims law," to issue a "civil investigative demand." A CID requires a person whom the Attorney General believes to be in possession, custody or control of "documentary material or information relevant to a false claims law investigation" to produce that evidence. After receiving the required copy of the complaint and other information in the *qui tam* proceeding against Avco, the Attorney General commenced an investigation of the alleged violations of the Act by Avco and served at least four CIDs, including one directed to Kim. That CID demanded that Kim, a metallurgist employed by Avco in its Textron Lycoming Division, produce certain documents con-

---

1. The complaint and certain other filings in the District Court proceedings name the defendant corporation as "Textron Lycoming Corpora-
tion." According to the parties, Textron Lycoming is not a corporate entity, but rather a division of Avco Corporation.

cerning the LTS–101 engine manufactured by Avco for use in United States Coast Guard helicopters, and give oral testimony concerning, *inter alia,* characteristics and performance of that engine and its component parts. Kim filed with the District Court a petition pursuant to section 3733(j)(2), seeking to set aside the CID. Pursuant to order of the District Court, the government disclosed the existence of the *qui tam* proceeding and filed a cross-petition under section 3733(j)(1), which provides for judicial enforcement of CIDs.[2]

Kim argued that the filing of the *qui tam* proceeding had cut off the power of the Attorney General to issue the instant CID, and that the government was unlawfully conducting civil discovery in the pending action through *ex parte* investigative demands. The District Court found no merit in that contention, allowed the government's petition for enforcement, and denied Kim's petition to set the demand aside. For the reasons set forth below, we uphold the District Court.

## II. ANALYSIS

 The resolution of the question presented by Kim's objection to the Attorney General's use of his power to issue CIDs depends on the construction of section 3733(a)(1) of the Act. That section provides that "whenever the Attorney General has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation, the Attorney General may, before commencing a civil proceeding under section 3730 or other false claims law, issue in writing and cause to be served upon such a person, a civil investigative demand.…" *Id.* 31 U.S.C. § 3733(a)(1). Both parties concede—and it is evident to anyone reading the statute—that the Attorney General may not employ the power granted by this section after he has commenced a false claims action. Kim contends that the Attorney General is likewise precluded from issuing CIDs when someone else, *i.e.,* a *qui tam* relator, has initiated such a proceeding.

Nothing in the words of the enactment compels the result Kim proposes. In common English usage, a participial phrase such as "before commencing a civil action" refers to the subject of the sentence, in this case "the Attorney General." *See* W. STRUNK AND E. WHITE, *The Elements of Style* 13–14 (3d ed. 1979). Therefore, the plain meaning of the section is "the Attorney General may, before the *Attorney General* commences a civil proceeding under section 3730 … issue a civil investigative demand."

This would seem to answer the question before us: "Where the language of a statute is clear in its application, the normal rule is that we are bound by it." *Public Citizen v. United States Dep't of Justice,* — U.S. ——, ——, 109 S.Ct. 2558, 2574, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring). Appellant would have us look to the legislative history of the 1986 amendments to the Act and conclude that the statute in fact means "the Attorney General may, before *anyone* commences a civil proceeding under 3730 … issue a [CID]." As we recently observed in a different context, "it is only waggishly stated that 'where the statutory history is ambiguous, we will look to the words of the statute,' .…" *Antolok v. United States,* 873 F.2d 369, 377 (D.C.Cir.1989). In *Antolok* we found that we would have reached the same result even if that were the rule because the legislative history and the statute in that case were consistent. In the present case, appellant seeks by ambiguous legislative history to override the most natural reading of the statute.

Insofar as any ambiguity exists in the present statute it focuses on the meaning

**2.** Avco also appeared as a petitioner in the District Court and appears on appellant's brief as a co-appellant in the present proceedings. The government argues that there is no subject matter jurisdiction as to Avco, as section 3733(j)(2) confers the right to petition to set aside a CID only upon the person receiving it, not upon the subject of the investigation. Because our jurisdiction and that of the District Court is plain as to the government and Kim, and they are the only parties essential to the resolution of this action, we need not rule on that objection.

of the word "commences." Appellant makes the very plausible argument that in the case of a *qui tam* proceeding the Attorney General never "commences" a civil proceeding because the relator has already commenced the proceeding before the Attorney General is even aware of it. As appellant notes, if the language is taken with absolute literalness on this point, then the Attorney General could intervene in the litigation but continue to use the CID as an extraordinary and *ex parte* means of obtaining discovery. This would indeed be an unusual result. There is certainly authority that "where the plain language of the statute would lead to 'blatantly absurd consequences,' ... that 'Congress could not *possibly* have intended,' ... we need not apply the language in such a fashion." *Public Citizen,* —— U.S. —— at ——, 109 S.Ct. 2558 at 2574 (Kennedy, J., concurring) (emphasis in original) (citations omitted). However, in the present case we need not determine whether that result would be sufficiently "absurd" for us to determine that "Congress could not possibly have intended" it. In the present case, the Attorney General has not used the CID power after intervention; indeed, he has not intervened. The Department of Justice concedes that the word "commencing" should be construed illiterally to encompass "intervening." If some future Attorney General should disagree with this interpretation and attempt to issue a CID after intervening in and taking control of a *qui tam* proceeding under section 3730(b)(4)(A), it is not unlikely that we would reject that new interpretation, but we need not decide that hypothetical.

Once that semantic Rubicon is crossed, that is including "intervening" within the scope of "commencing," the argument based on legislative history becomes quite unconvincing. That argument is essentially fourfold. First, appellant looks to several references in the legislative history referring to the CID as a "pre-litigation" or "pre-lawsuit" investigatory tool. *See, e.g.,* H.R.REP. No. 660, 99th Cong., 2d Sess. 26 (1986); *id.* at 33; S.REP. No. 345, 99th Cong., 2d Sess. 33 (1986). Second, Kim

argues that we should attach significance to the absence from the legislative history of any reference to the use of a CID during the sixty-day (or extended) waiting period during which the Attorney General makes his determination. Third, appellant argues that authorization of CID issuance during the sixty-day (or extended) period is inconsistent with the rationale for the new provision under which the *qui tam* complaint is initially filed under seal. Fourth, he asserts that Congress contemplated that the CID would not be used routinely but rather as a tool of last resort, as the House Report noted: "The Committee does not intend that CIDs be issued in every potential civil fraud case, but only in those instances where it is absolutely necessary to determine whether a fraud action under the Act is appropriate." H.R.Rep. No. 660, 99th Cong., 2d Sess. 26 (1986).

Appellant's first argument fails because none of the legislative history cited out of context by appellant occurred in any discussion of the question here under review. Nor does the legislative record indicate that Congress at any point discussed the specific language we are called upon to construe. Each of the statements cited by appellant is just as consistent with limitation of the use of CIDs to a time before the Attorney General's action in litigating as it is with appellant's proposed preclusion based on the commencement of litigation by someone else. Neither the cited portions nor any other segment of the legislative history provides us with the sort of unambiguous direction that might give us pause in following the plain words of the statute. Further, as appellant himself points out, at the time of the adoption of section 3733 Congress was fully aware of pre-existing CID authority in the antitrust context under 15 U.S.C. § 1312 (1982). As appellant also points out, that power is limited by the words of its enabling statute to times "prior to the institution of a civil or criminal proceeding...." 15 U.S.C. § 1312(a)(1982). Assuming, as appellant argues, that the antitrust statute means prior to the commencement of such action

by *anyone*,[3] then we in the present inquiry cannot presume that Congress intended the same thing where it expressly used different language. Although we may not afford this different language the presumption of different meaning we might extend if the two statutes had been adopted simultaneously or as part of the same statutory scheme, *see, e.g., Tafoya v. United States Dep't of Justice,* 748 F.2d 1389, 1391–92 (10th Cir.1984); *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972); *Lankford v. Law Enforcement Assistance Admin.,* 620 F.2d 35, 36 (4th Cir.1980), we certainly cannot presume the contrary— that *different* language in two statutes has the *same* meaning. Insofar as the otherwise similar structure but different language influences our decision at all, it must influence it away from a similar construction rather than toward it. In any event, it is of little moment, since for the most part what this page of legislative history does is simply reiterate the ambiguity of the legislative history on this question, not explain or clarify any ambiguity in the statute, and therefore once again we repeat that we follow the plain words of the statute, not its ambiguous history. As we have noted, "resort may be had to legislative history when a statute is ambiguous, or where the ordinary meaning would lead to absurd or futile result. But 'the plainer the language, the more convincing contrary legislative history must be.'" *Cole v. Harris,* 571 F.2d 590, 597 (D.C.Cir.1977) (citations omitted).[4] Nothing in the legislative history of the present plain language meets that high standard.

Appellant's second line of argument is even less convincing than his first. Appellant would have us adopt his construction of the statute because the legislative history of the 1986 amendments to the Act contains no mention of the use of CID authority during the sixty-day (or extended) pre-intervention period. In appellant's view, "[i]n the overall context of the False Claims Amendments Act, the absence of some statement to that effect in the legislative history is quite significant." Brief of Appellant at 30. The short answer to this argument is that there is no mention of this subject one way or the other. If the words of the legislative history discussed above are ambiguous, silence in legislative history is almost invariably ambiguous. If a statute is plain in its words, the silence may simply mean that no one in Congress saw any reason to restate the obvious. If the words of a statute are otherwise ambiguous, it is difficult to conceive of situations in which congressional silence would lend great clarity. As we have previously stated:

> Drawing inferences as to congressional intent from silence in legislative history is always a precarious business. Here, for example, the absence of any explanatory reference to the phrase in floor debates and committee reports could well evince Congress' feeling that the language employed was so clear as not to require elaboration. In any event, appellees' theory of statutory interpretation would allow courts to read out of a statute an unambiguous phrase when no explanation of it exists in the legislative history. This is, in our view, a unique principle of statutory construction, and one we cannot embrace.

*Symons v. Chrysler Corp. Loan Guarantee Bd.,* 670 F.2d 238, 242 (D.C.Cir.1981). The words of Judge Tamm in *Symons,* although directed to the arguments of another litigant concerning other legislation,

---

**3.** It is not by any means absolutely clear that this was the intent of Congress in the antitrust CID statute. A fuller reading of 15 U.S.C. § 1312(a) than cited by appellant discloses that the context includes the language "he [the Attorney General] may, prior to the institution of a civil or criminal proceeding thereon ..., issue a CID." Since the word "thereon" refers back to the clause "relevant to a civil antitrust investigation," it is at least arguable that even in the antitrust context, the preclusion of the Attorney General's use of CIDs occurs only on institution of an action based on the investigation, presumably an action by the United States as opposed to one by a private party. Obviously we need not resolve that question for purposes of the present decision and therefore assume that appellant's construction of the statute is correct, although we have found no decision construing that language either way.

**4.** *See* further discussion *infra.*

most aptly answer the contentions of appellant in the present case.

Appellant next contends that for Congress to have authorized use of the CID-issuing power during the sealing period of the *qui tam* complaint is inconsistent with the purpose of the sealing provision. He bases this argument on a single phrase from the legislative history: "[I]n response to Justice Department concerns that *qui tam* complaints filed in open court might tip off targets of ongoing criminal investigations, the subcommittee adopted a 60–day seal provision for all *qui-tam* complaints." S. REP. NO. 345, 99th Cong., 2d Sess. 16 (1986), U.S.Code Cong. & Admin. News 1986, p. 5281. Appellant argues that if the purpose of sealing the *qui tam* is to prevent tipping off potential false claims defendants in the course of ongoing criminal investigations, then Congress must not have contemplated use of the CID during the period of the sealed *qui tam* complaint, because the CID could have a similar tipping-off effect. Although we are not aware of any case in which a court has altered the plain language of a statute to conform it to a single statement in the report of one house of Congress expressing one purpose of one section of a complex scheme of legislation, we will afford this argument some short discussion. To the reader who desires a more detailed response, we commend the full Senate Report, especially pages 24 and 25 which discuss the sealing provision at some length.

For our purposes, in addition to our earlier comments on the pre-eminence of clear statutory language over ambiguous legislative history, we simply add that the single sentence quoted by appellant from page 16 of the Senate Report is from a summary of amendments that is found in a brief history of the False Claims Reforms Act, which was the genesis of the present statute. The quoted sentence is the only portion of that four-and-one-half page history which mentions the purpose of the sealing provision. Following that history is a section-by-section analysis of the bill comprising approximately eighteen-and-one-half pages. All of page 24 and part of page 25 of the Report discuss the sealing provision. Included in this extended discussion are some rather salient comments totally inconsistent with appellant's contentions. The Report states, for example, that "[b]y providing for sealed complaints, the Committee does not intend to affect defendants' rights in any way.... The initial 60–day sealing of the allegations has the same effect as if the *qui tam* relator had brought his information to the Government and notified the Government of his intent to sue. The Government would need an opportunity to study and evaluate the information in either situation." *Id.* at 25.[5]

If the sealing does not affect defendants' rights in any way, it is difficult to see how it can afford anyone a new right to be free of the government's use of its valuable investigative tool, the CID. Similarly, if the effect of the filing of the sealed complaint is the same as if the *qui tam* relator had presented the evidence to the government with notice of his intent to sue, it is again difficult to see how the CID power can be interrupted by filing, inasmuch as no one contends that the CID power is precluded by the simple giving of notice. Indeed, this line of appellant's argument points up a highly anomalous result that would ensue were we to adopt his interpretation of the statute. Assuming that the Attorney General, as contemplated by Congress, was in the throes of an on-going investigation and a *qui tam* relator suddenly filed his independent suit, the Attorney General, would immediately lose a tool available to him one second before the filing.

Even if the Attorney General had already prepared a CID and was in the process of arranging service, any citizen could immediately disrupt the planned course of the investigation by filing suit. This disruption would occur even if such citizen were acting in collusion with the prospective defendant. The Attorney General, en-

---

**5.** We commend the ethical candor of appellant's counsel in noting the portion of the report *con-* *tra* to his position in his brief.

gaged in the investigation of, for example, a blatantly fraudulent defense contract, might well have decided to use CIDs as principal soldiers in his paper war. Before he could even take the field, the enemy could not only wound but also kill the general's intended troops by collusive lawsuit. This is true because, by the terms of the statute, once the power to issue CIDs is lost by the Attorney General's commencement of litigation, it never returns. If we were to adopt appellant's construction of the statute, we would be concluding that Congress had intended that *qui tam* relators—who can be anyone—could innocently or collusively deprive the Attorney General of a weapon Congress had been at pains to give him in the same set of amendments that made the *qui tam* proceeding a better weapon. The illogic of this proposition is inescapable and we will not adopt it.

Appellant's fourth argument is that "Congress plainly contemplated that the CID would not be used routinely but would be an investigative tool of last resort." Brief of Appellant at 33. This statement is undoubtedly true. As the House Report explains: "The Committee does not intend that CIDs be issued in every potential fraud case, but only in those instances where it is *absolutely necessary* to determine whether a fraud action under the Act is appropriate." H.R.Rep. No. 66, 99th Cong., 2d Sess. 26 (1986) (emphasis added). The difficulty with this argument is that it has nothing to do with appellant's proposed construction of section 3733. The quoted section of the House Report concerned the non-delegable nature of the Attorney General's power. Not only that bit of legislative history, but also the very inclusion in the statutory language of the express provision that "the Attorney General may not delegate the authority to issue civil investigative demands under this subsection," certainly evidence a congressional decision against routine use of this extraordinary investigative tool. Even without the legislative history, it is obvious that a power which can be exercised only by a cabinet officer is not expected to be used in routine matters. But in no way does either the statutory language or the quoted section of legislative history support a conclusion that the power either can or cannot be used during the sealing period of a *qui tam* complaint. Again appellant's argument fails.

While we have not discussed every one of appellant's arguments, we have thoroughly reviewed them all and find none to evidence sufficient merit to warrant reversal of the District Court's decision.

### III. CONCLUSION

As we have set forth more fully above, appellant's contentions rest on a construction of the statute inconsistent with its most natural reading. Nothing in the legislative history or any other tool of statutory construction warrants a departure from that reading of the language of the statute. We therefore conclude that the District Court properly construed the statute and that the order we review is without error.

*Affirmed.*