164 F.3d 661
 334 U.S.App.D.C. 82
 INDEPENDENT BANKERS ASSOCIATION OF AMERICA and American
Bankers Association, Appellants,
v.
FARM CREDIT ADMINISTRATION, Appellee.
 No. 98-5020.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 9, 1998.
Decided Jan. 19, 1999.
 
 Appeal from the United States District Court for the District of Columbia (No. 97cv00695).
 Michael F. Crotty argued the cause for appellants. With him on the briefs were John J. Gill and Leonard J. Rubin.
 Michael S. Raab, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice.
 Arvid E. Roach, II, argued the cause and filed the brief for amicus curiae Farm Credit Council.
 Before: SILBERMAN, ROGERS and GARLAND, Circuit Judges.
 ROGERS, Circuit Judge:
 
 
 1
 Since 1916, the federal government has provided assistance to farmers in securing agricultural loans. With the enactment of the Federal Farm Loan Act, ch. 245, 39 Stat. 360 (1916), and the Farm Credit Act of 1933, ch. 98, 48 Stat. 257 (1933), Congress established a system of banks and cooperative lending associations, known as the Farm Credit System, designed to provide credit to agricultural producers and farm-related businesses. In 1971, Congress revised the System in the Farm Credit Act of 1971, Pub.L. No. 92-181, 85 Stat. 583 (1971) (codified as amended at 12 U.S.C. § 2001, et seq.). At issue here are the regulations promulgated by the Farm Credit Administration on January 30, 1997, to expand the availability of credit to farmers and certain businesses. See 62 Fed.Reg. 4429 (1997) (codified at 12 C.F.R. pts. 613-615, 618-620, and 626). Several commercial banks opposed the revised regulations on the ground that they exceeded the scope of the agency's authority under the statute. When the agency rejected these contentions, two national trade groups, appellants Independent Bankers Association and American Bankers Association, filed suit. Objecting to the expansion of Farm Credit System loan availability to farm-related service businesses, processing and marketing operations, legal entities in general, and rural home owners, appellants argued that only Congress can authorize these expansions of credit to individuals and entities that previously had been barred by the regulations from receiving System loans.[1] The district court granted summary judgment to the agency and denied appellants' cross-motion for summary judgment. See Independent Bankers Ass'n of Am. v. Farm Credit Admin., 986 F.Supp. 633 (D.D.C.1997). We hold that, with two exceptions, the revised regulations are consistent with the statute. The two exceptions are the regulations allowing Farm Credit Banks to extend loans to farm-related businesses for activities beyond those listed in § 2019(c)(1), and rural housing loans to non-owner-occupied residences. Accordingly, we affirm in part and reverse in part.
 
 I.
 
 2
 The Farm Credit Administration regulates a system of banks and cooperative lending associations designed to improve "the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations." 12 U.S.C. § 2001(a) (1994). Congress sought to assure that "American farmers have available a dependable supply of credit on terms tailored to their special needs and capabilities and adjusted regularly to changing economic and agricultural conditions." S.Rep. No. 92-307, at 7 (1971), U.S. Code Cong. & Admin. News at 1266. The Farm Credit Loan System currently includes, according to the agency's brief, over 200 cooperative lending associations and eight banks--six Farm Credit Banks, one bank for cooperatives, and one agricultural credit bank. See generally 12 U.S.C. § 2002(a) (1994).
 
 
 3
 On September 11, 1995, the agency announced a proposed revision to its regulations that would modify eligibility requirements and the scope of permissible lending, with the intent "to eliminate unnecessary regulatory restrictions and implement statutory changes" from the early 1990s. See 60 Fed.Reg. 47103, 47103 (1995). This effort included removing regulatory restrictions on lending that the agency concluded were not required by the statute. In promulgating its final rule on January 30, 1997, see 62 Fed.Reg. 4429 (1997), the agency rejected the argument of several commercial banks that the statute and its legislative history mandated that the Farm Credit System be "a lender of last resort serving only those rural credit markets that have been abandoned by other lenders." Id. at 4434. The agency expanded who qualified for System loans and the circumstances under which the System would make loans available. Appellants object to six of these changes, which took effect on March 11, 1997.
 
 
 4
 As to farm-related businesses, the agency adopted a revised version of 12 C.F.R. § 613.3020(a), which provides that "[a]n individual or legal entity that furnishes farm-related services to farmers and ranchers that are directly related to their agricultural production is eligible to borrow from a Farm Credit bank or association that operates under titles I or II of the Act."[2] The new regulations removed the prior requirement that farm-related businesses were eligible for lending only if they engaged in providing "custom-type farm-related services directly related" to farmers' "on-farm operating needs." 12 C.F.R. § 613.3050(a) (repealed 1997).[3] These services are defined as "tasks that farmers and ranchers can perform for themselves, but instead hire outside contractors to perform." 62 Fed.Reg. at 4438. The agency explained the change by noting that the statute did not mention the term "custom-type services" and that a reasonable interpretation of the term "farm-related services" should include technologically advanced services that directly relate to agricultural production but which farmers could not provide for themselves. Id.
 
 
 5
 The agency also expanded the type of farm-related business activities that qualify for lending. Under the old regulation, a farm-related business could receive "long-term real estate mortgage loans ... for necessary sites, capital structures, equipment, and initial working capital for such services." § 613.3050(c)(1) (repealed 1997). The new regulation, however, permits financing for "[a]ll of the farm-related business activities" of a business, provided that a majority of its income arises from furnishing farm-related services.[4] § 613.3020(b)(1) (1998).
 
 
 6
 Finally as to farm-related businesses, the new regulation removes the former prohibition on lending to commercial businesses that "purchase farm products from or sell inputs to farmers or ranchers unless substantially all of such inputs handled are used incident to the services provided." § 613.3050 (b)(2) (repealed 1997). The regulations eliminate this requirement, as § 613.3020 now allows "whole-firm financing" of businesses that derive a majority of their income from providing farm-related services. See 62 Fed.Reg. at 4438.
 
 
 7
 As for processing and marketing loans, the agency loosened the ownership requirements for loan applicants. Previously, the agency had required that "bona fide farmers"[5] and other agricultural producers own 100 percent of a processing and marketing operation if the operation and its owners produced under 50 percent of the annual "throughput."[6] § 613.3045(b)(2)(iii) (repealed 1997); see also 61 Fed.Reg. at 42,105. Under the new regulation, a legal entity engaging in processing and marketing qualifies for financing so long as "eligible borrowers under § 613.3000(b) own more than 50 percent of the voting stock" and the entity or its owners "regularly produce[ ] some portion of the throughput."[7] § 613.3010(a)(1)-(2) (1998). The agency explained that this revision expanded the pool of potential borrowers yet still reflected a congressional concern that farmers exercise "substantial control" over the borrowing entity--in this case, a majority interest. 62 Fed.Reg. at 4437.
 
 
 8
 The agency also changed the ownership requirements for legal entities in general. Previously, legal entities were eligible for credit only if (1) they were majority owned by agricultural producers, (2) a majority of their assets related to agricultural production, or (3) a majority of their income arose from farming or the harvesting of aquatic products. § 613.3020(b) (amended 1997). The agency repealed these restrictions so that "all legal entities ... will now be eligible for [System] financing on the same basis as other farmers." 62 Fed.Reg. at 4437. The new regulations, however, retain a prior limitation that restricts credit to farmers "as the emphasis moves away from the full-time bona fide farmer" to businesses whose focus is "essentially other than farming." Compare § 613.3005(a) (1998) with § 613.3005(a) (amended 1997). Both new and old regulations state that
 
 
 9
 [i]t is the objective of each bank and association, except for banks for cooperatives, to provide full credit, to the extent of creditworthiness, to the full-time bona fide farmer (one whose primary business and vocation is farming ...); and conservative credit to less than fulltime farmers for agricultural enterprises, and more restricted credit for other credit requirements as needed to ensure a sound credit package ... as long as the total credit results in being primarily an agricultural loan.
 
 
 10
 § 613.3005 (1998); see also § 613.3005(a) (repealed 1997) (using almost identical language).
 
 
 11
 Further, the new regulations expand who qualifies for rural home loans. Prior to the revisions, the Farm Credit System provided financing only for those rural residences that were owner-occupied. § 613.3040(b) (repealed 1997). The old regulation explicitly prohibited loans "to purchase or construct a rural residence for the express purpose of rental or resale." § 613.3040(c) (repealed 1997). The new regulations provide that "[a]ny rural homeowner is eligible to obtain financing on a rural home," although he or she is only eligible for loans on "one rural home at any one time." § 613.3030(b) (1998). Both versions limit these loans to "buying, building, remodeling, improving, repairing," or refinancing rural homes. Compare § 613.3030(c) (1998), with § 613.3040(c) (repealed 1997).
 
 
 12
 Appellants filed suit in the district court, alleging that the regulations violated the plain language of the statute as well as congressional intent. They also asserted that the adoption of §§ 613.3020 (financing for farm-related service businesses), 613.3100 (domestic lending), 613.3010 (financing for processing and marketing operations), 613.3000 (definitions), and 613.3030 (rural home financing) was arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2). The district court granted summary judgment to the agency, concluding that "[t]he broad, permissive language of the statute clearly covers the more expansive lending under the new regulations.... [T]he mere fact that the agency had not seized upon the full scope of its lending authority in the past in no way precludes it now from reasonably adopting such regulations."[8] Independent Bankers, 986 F.Supp. at 640.
 
 II.
 
 13
 This court reviews de novo the district court's grant and denial of the parties' motions for summary judgment. See Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 491-92 (D.C.Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 337, 142 L.Ed.2d 278 (1998); Consumer Fed'n of Am. v. United States Dep't of Health & Human Serv., 83 F.3d 1497, 1501 (D.C.Cir.1996). In evaluating an agency's interpretation of a statute it administers, courts apply the deferential standard articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under this test, courts must consider
 
 
 14
 [f]irst, ... whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 15
 Id. at 842-43, 104 S.Ct. 2778. With the exception of regulations governing rural housing and certain Farm Credit Bank loans to farm-related businesses, we hold that the agency's regulations are consistent with the statute's language and congressional intent.
 
 
 16
 Farm-Related Businesses. Appellants object to three aspects of the new regulations regarding farm-related services: (1) the expansion of credit by farm credit banks for all of a farm-related businesses' activities, rather than just for "necessary sites, capital structures, equipment and initial working capital," see § 613.3050(c) (repealed 1997), (2) the removal of the requirement that the services be "custom-type services" that farmers could otherwise do by themselves, and (3) the agency's alleged failure to restrict sufficiently loans to businesses providing goods, rather than services, to farmers.
 
 
 17
 The statute provides that "[t]he credit and financial services authorized in this subchapter may be made available ... [to] persons furnishing to farmers and ranchers farm-related services directly related to their on-farm operating needs." 12 U.S.C. § 2017 (1994). It further provides that loans by farm credit banks "to persons furnishing farm-related services ... may be made for the necessary capital structures and equipment and initial working capital for such services."[9] 12 U.S.C. § 2019(c)(1). The district court found that the language of these provisions was permissive and therefore did not restrict the Farm Credit System to providing loans only for the circumstances explicitly listed in the statute. See Independent Bankers, 986 F.Supp. at 641. It therefore reasoned that the agency had not exceeded the scope of the statute by permitting loans to "[a]ll of the farm-related business activities of an eligible borrower who derives more than 50 percent of its annual income ... from furnishing farm-related services that are directly related to the agricultural production of farmers and ranchers." See § 613.3020(b)(1) (1998).
 
 
 18
 Appellants, however, contend that § 2019(c)(1) limits Farm Credit Bank lending to the purposes listed in the statute, such as "necessary sites, capital structures." They note that § 2019(a), which governs lending to farmers, uses much broader language, in that a Farm Credit Bank may make loans for "any agricultural or aquatic purpose and other credit needs of the applicant." 12 U.S.C. § 2019(a)(1) (1994). The agency, in turn, responds that the statute uses permissive language, such as "may," and that the list of activities in § 2019(c)(1) is illustrative rather than exclusive. In addition, appellants maintain that, if Congress intended § 2019(c)(1) to cover activities as extensively as § 2019(a), it could have used similarly broad language rather than listing specific qualifying purposes for the extension of credit. We agree. If Congress had wanted businesses providing farm-related services to receive loans from farm credit banks on the same basis as farmers, it could easily have used expansive language in subsection (c)(1). " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' "[10] Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir.1972)); see also Halverson v. Slater, 129 F.3d 180, 185 (D.C.Cir.1997). For these reasons, we conclude that the agency's extension of Farm Credit Bank loans for any business activities of a farm-related service business is contrary to the language of the statute and congressional intent.
 
 
 19
 Appellants also challenge the change relating to custom-type services. Prior to the new regulations, the agency defined farm-related services to include only those "[c]ustom-type services ... that farmers and ranchers can perform for themselves, but instead hire outside contractors to perform." See 62 Fed.Reg. at 4438. In removing this restriction, the agency explained that the statute itself never mentions custom-type services, that the examples of custom-type services listed in the legislative history are "illustrative," see id., and that eliminating this requirement advances the broad purpose of the statute "because farmers today rely on technologically advanced services that they cannot perform for themselves." 61 Fed.Reg. at 42,108. The use of these services, in turn, allows farmers to "(1) [i]ncrease their income; (2) reduce their operating costs; (3) improve farm productivity; and (4) satisfy consumer demands for improved food quality and specialty food products." Id.
 
 
 20
 The plain language of the statute does not mandate that farm-related services only include "custom-type services." Section 2017(2) provides that loans may be made available to "persons furnishing to farmers and ranchers farm-related services directly related to their on-farm operating needs." 12 U.S.C. § 2017(2) (1994). The use of technologically advanced services that farmers cannot provide for themselves appears to qualify as a "farm-related service[ ] directly related" to the farmer's operational needs. 12 U.S.C. § 2075(a)(3) (1994). Allowing financing for services that modern farming requires but which farmers could not traditionally provide for themselves is reasonably consistent with the statute's broad purposes.
 
 
 21
 "Where, as here, the plain language of the statute is clear, the court generally will not inquire further into its meaning, at least in the absence of a clearly expressed legislative intent to the contrary." Lin Qi-Zhuo v. Meissner, 70 F.3d 136, 140 (D.C.Cir.1995) (citations and internal quotation marks omitted). Appellants contend, however, that the term "farm-related services" had an accepted meaning at the time of the law's adoption to include only custom-type services. For support, they cite several arguably ambiguous portions of the legislative history discussing the need to extend financing to businesses providing custom-type services, without necessarily excluding other types of businesses.[11] None of the passages relied upon indicate that Congress ascribed a special meaning to the term "farm-related services," only that some individuals may have wanted lending to farm-related businesses to be limited to custom-service providers. The court has previously avoided giving undue weight to the testimony of witnesses at congressional hearings because their views may not reflect those of the legislators who actually voted on the bill. See Austasia Intermodal Lines, Ltd. v. Federal Maritime Comm'n, 580 F.2d 642, 645 (D.C.Cir.1978). Likewise, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Given the clear language of the statute, selected and arguably ambiguous snippets of the legislative history are insufficient to undermine that language. See Avco Corp. v. United States Dep't of Justice, 884 F.2d 621, 623 (D.C.Cir.1989).
 
 
 22
 Nor, as appellants contend, is the agency's interpretation due "considerably less deference" because it "is a major deviation" from the agency's position at the time the statute was enacted--i.e., the agency itself limited lending to custom-service providers only. The Supreme Court has noted that, although long-standing agency interpretations may have "a certain credential of reasonableness, ... neither antiquity nor contemporaneity with the statute is a condition of validity." Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 740, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." Chevron, 467 U.S. at 863-64, 104 S.Ct. 2778. In the instant case, given the absence of any restrictive language within the statute and given the agency's judgment that providing financing for technologically advanced services furthers the broad goals of the statute, the agency's removal of the custom-services requirement reflects a permissible interpretation.
 
 
 23
 Appellants also raise a goods-versus-services objection. The old regulations provided that "[l]oans shall not be made to commercial businesses which purchase farm products from or sell inputs to farmers or ranchers unless substantially all of such inputs handled are used incident to the services provided." § 613.3050(b)(2) (repealed 1997). The new regulations lack this requirement. Under the new § 613.3020, a legal entity that derives more than 50 percent of its annual income from furnishing farm-related services is eligible for "whole firm" financing--i.e., it can obtain loans for "[a]ll of [its] farm-related business activities." If, however, the legal entity derives 50 percent or less of its income from such services, loans will be available only for its "farm-related services activities."
 
 
 24
 Section 2019(c)(1) provides that "[l]oans to persons furnishing farm-related services to farmers and ranchers directly related to their on-farm operating needs may be made for the necessary capital structures and equipment and initial working capital of such services." 12 U.S.C. § 2019(c)(1) (1994). Sections 2017(2) and 2075(a)(3), in turn, permit loans to persons who furnish "farm-related services directly related to ... on-farm operating needs." The agency argues that "[n]othing in the statute renders [these] persons ineligible to obtain System credit for the purchase or sale of farm-related goods."[12]
 
 
 25
 Appellants do not object to the prior regulation, which allowed lending to businesses dealing in "inputs" to farmers if "substantially all of such inputs" were used in the providing of services. Yet, this prior regulation allowed lending to businesses who sold goods. The new regulation, like the old, ties the availability of loans to the provision of services: either (1) the business must make a majority of its income from providing services or, (2) if it does not, it may only obtain loans for the provision of services. Hence, it is unclear why appellants object to the new regulation and not the old, as both allow loans to businesses that furnish goods so long as those goods are tied to services. If the concern is providing loans to businesses that provide goods, the old regulation would also seem, under appellants' view, to be an unwarranted expansion of the agency's authority. The new regulations, however, are consistent with the plain language of §§ 2017(2) and 2075(a)(3), which contemplate loans to businesses that furnish services, without limiting financing to exclude all goods. The agency's adoption of these modifications is a reasonable interpretation of the statute.
 
 
 26
 Processing and Marketing Loans. Section 2019(a)(1) provides that loans may be made
 
 
 27
 to farmers, ranchers, and producers or harvesters of aquatic products ... for any agricultural or aquatic purpose and other credit needs of the applicant, including financing for basic processing and marketing directly related to the applicant's operations and those of other eligible farmers, ... except that the operations of the applicant shall supply some portion of the total processing or marketing for which financing is extended.[13]
 
 
 28
 12 U.S.C. § 2019(a)(1) (1994); see also 12 U.S.C. § 2075(a)(1) (1994) (allowing production credit associations to make short- and intermediate-term loans under similar circumstances). Appellants claim that the plain language of the statute requires that the applicant be an agricultural producer and therefore only smaller, farmer-owned processing and marketing operations should be eligible for financing.
 
 
 29
 The new regulation removes the requirement that legal entities applying for such loans be owned 100 percent by bona fide farmers. 61 Fed.Reg. at 42105. Now, a legal entity providing processing and marketing qualifies for financing if bona fide farmers own more than 50 percent of the voting stock and the applicant and its owner "regularly produce[ ] some portion of the throughput used" by the operation. § 613.3010(a) (1998). Under either regulation, legal entities could obtain financing for their processing and marketing operations, provided that they were controlled by actual farmers. Appellants' objection is thus one of degree: how much ownership of the legal entity is enough before the business is no longer farmer-controlled. The statute does not directly address this issue, and appellants fail to demonstrate that the agency's requirement that farmers have a majority-ownership of the operation is not a reasonable interpretation.[14]
 
 
 30
 Eligibility of Legal Entities. Appellants further contend that the new regulations permit any corporation to be "eligible for System lending so long as it engages in farming as any part of its business, to the extent of its involvement in that business." They object that this regulation represents an abandonment of the prior focus on natural persons as the major beneficiaries of the statute and that it broadens lending authority to corporations. Indeed, the new regulations remove prior requirements that legal entities either be majority owned by farmers, have a majority of their assets related to agricultural products, or have a majority of their income arise from farming. See § 613.3020 (amended 1997). The new regulation adopts a sliding scale in which banks and associations are to provide full credit to full-time bona fide farmers, conservative credit to part-time farmers, and "more restricted credit for other credit requirements as needed to ensure a sound credit package ... as long as the total credit results in being primarily an agricultural loan." § 613.3005 (1998).
 
 
 31
 In appellants' view the new regulations read the word "bona fide" out of § 2017's eligibility requirements, which define eligible borrowers as "bona fide farmers, ranchers, or producers or harvesters of aquatic products." The statute does not define the term "bona fide," although the agency defines a bona fide farmer as "a person owning agricultural land or engaged in the production of agricultural products, including aquatic products under controlled conditions." § 613.3000(a)(1) (1998). The agency defines "person" to mean "an individual who is a citizen of the United States or a foreign national who has been lawfully admitted into the United States...." § 613.3000(a)(3) (1998).
 
 
 32
 The prior regulations allowed a number of legal entities to receive financing so long as a majority of their ownership, assets, or income was related to farmers or farming. The new regulations simply allow the agency greater flexibility in determining whether a legal entity should receive financing, while retaining that paramount concern that such financing "be primarily an agricultural loan." § 613.3005 (1998). Under this system, "full-time bona fide" farmers continue to be the most favored applicants for loans. Id. The new regulations do not conflict with the statutory scheme, and the agency's regulation is a reasonable effort to establish a hierarchy of preferred borrowers consistent with the statute. Indeed, the statute itself indicates that Congress' objective was to "encourage farmer- and rancher-borrowers participation in the management, control, and ownership of a permanent system of credit for agriculture which will be responsive to the credit needs of all types of agricultural producers having a basis for credit...." 12 U.S.C. § 2001(b) (1994) (emphasis added).
 
 
 33
 Rural Housing. Finally, appellants object to the elimination of the ban on financing of rural housing that is not owner-occupied. The agency no longer requires applicant owners to live in their rural residences, provided that they receive loans on only one rural home, which must be used as a principal residence by either their tenant or themselves. See 62 Fed.Reg. at 4438. The agency retained restrictions that prevented lenders from financing housing in suburban and urban areas, by defining qualifying communities as having populations of 2,500 people or less. Id. at 4438-39.
 
 
 34
 The statute provides that "[l]oan and discounts may be made to rural residents for rural housing financing under regulations of the Farm Credit Administration," provided that such housing "be for single-family, moderate-priced dwellings and their appurtenances" in rural areas where the population in a given community does not exceed 2,500 inhabitants. 12 U.S.C. § 2019(b)(1)-(3) (1994). Appellants interpret the phrase "rural residents" to mean that owners must reside in the rural home to qualify for the loan. They further maintain that this modification will "extend System financing to wealthy, big-city dwelling passive investors who wish to build or acquire rural housing for lease to residents." The agency, in turn, considers that this expansion of credit is necessary "to ensure the availability of affordable housing for rural residents." 62 Fed.Reg. at 4438.
 
 
 35
 The statute provides that "owners of rural homes" are eligible for "credit and financial services authorized in this subchapter." 12 U.S.C. § 2017 (1994). Section 2019(b), in turn, states that the rural home financing "may be made to rural residents." The plain language of the statute refers to "residents" as the recipients of lending for this purpose. The statute does not define the term "rural resident" in § 2019, although the most natural reading of the statute suggests that Congress contemplated individuals who actually resided in rural areas. Although § 2017 identifies homeowners as eligible for lending, § 2019 establishes the purposes for which lending can be allowed and specifically notes that loans shall be made "to rural residents." The agency's interpretation effectively reads the statute as permitting lending to owners if rural residents are an indirect beneficiary of such loans. Such a reading of the statute conflicts with its plain language.[15]
 
 
 36
 Accordingly, we affirm in part and reverse in part the grant of summary judgment to the agency, reversing as to the regulations that extend lending to farm-related businesses by Farm Credit Banks for activities beyond those listed in § 2019(c)(1), and that allow home-owners to receive loans for non-owner-occupied rural housing. We also reverse in part the denial of summary judgment to appellants with respect to these two regulations and remand that part of the case to the district court for appropriate action.
 
 
 
 [1]
 In the district court, appellants also objected to a new regulation regarding System lending to service cooperatives. The district court accepted the agency's representation that this modification did not affect any substantive change to the old regulation and found that "[p]laintiffs at this time have no basis to challenge the agency's new regulation." Independent Bankers Ass'n of Am. v. Farm Credit Admin., 986 F.Supp. 633, 643 (D.D.C.1997). Appellants do not challenge this ruling on appeal
 
 
 [2]
 Title I governs federal land banks and federal land bank associations, while Title II governs federal intermediate credit banks and production credit associations. See Farm Credit Act of 1971, 85 Stat. at 583. Farm Credit Banks are banks established by a merger of a federal intermediate credit bank and a federal land bank, see 12 U.S.C. § 2011 (1994), and are governed by 12 U.S.C. §§ 2011-2023
 
 
 [3]
 All further citations to farm credit regulations are in Title 12 of the Code of Federal Regulations, unless otherwise indicated
 
 
 [4]
 If the borrower derives 50 percent or less of its income from such services, however, the regulation limits the approval of loans to "farm-related services...directly related to the agricultural production of farmers and ranchers." § 613.3020(b)(2) (1998)
 
 
 [5]
 The regulation defines the term "bona fide farmer" as "a person owning agricultural land or engaged in the production of agricultural products, including aquatic products under controlled conditions." § 613.3000(a)(1) (1998)
 
 
 [6]
 "Throughput" is the raw materials used in the processing and marketing operation. See S.Rep. No. 101-357, at 14-15, 258 (1990), reprinted in 1990 U.S.C.C.A.N. 4656
 
 
 [7]
 Section 613.3000(b) defines an eligible borrower as "a bona fide farmer or rancher, or producer or harvester of aquatic products."
 
 
 [8]
 The district court also ruled that "Plaintiffs clearly have associational standing in this case to bring the claim on behalf of their members." Independent Bankers, 986 F.Supp. at 639. The agency no longer challenges appellants' standing in light of National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)
 
 
 [9]
 Production credit associations are governed on this point by 12 U.S.C. § 2075(a)(3) (1994), which provides that loans may be made to "persons furnishing to farmers and ranchers farm-related services directly related to their on-farm operating needs." Appellants acknowledge that § 2019(c) does not apply to production credit associations and other providers of short-term and intermediate-term loans
 
 
 [10]
 The Senate Report states that "loans to persons furnishing farm related services to borrowers ... will include credit for capital equipment and initial working capital...." S.Rep. No. 92-307, at 20, 1971 U.S. Code Cong. & Admin. News at 1266 (emphasis added); see also H.R.Rep. No. 92-593, at 17 (1971), reprinted in 1971 U.S.C.C.A.N. 2091 (regarding House version of the bill). This language suggests that Congress did not contemplate that Farm Credit Banks would provide credit to farm-related services other than for "the necessary capital structures and equipment and initial working capital" listed in the statute. Cf. Halverson v. Slater, 129 F.3d 180, 187 n. 10 (D.C.Cir.1997)
 
 
 [11]
 For example, the governor of the Farm Credit Administration, testified that financing "should be limited to those [farm related businesses] who are providing services to the farmer ... which he traditionally has done himself but which, in the light of modern-day technology and conditions in agriculture, can be done more efficiently or effectively by a custom service or other business service." Farm Credit Act of 1971: Hearings on S. 1483 Before the Subcomm. on Agric. Credit and Rural Electrification of the Senate Comm. on Agric. and Forestry, 92d Cong. 211 (1971) (emphasis added). To the same effect, the chairman of the Senate Committee on Agriculture and Forestry noted that "farmers frequently turn to custom operators who provide on-the-farm services," and that to assure lending to such businesses "would not take in the entire agribusiness area, the committee restricted loans to persons furnishing services directly related to farm operating needs. These would be services which the farmer, under ordinary circumstances, would provide for himself." 117 Cong. Rec. 27,992 (1971)
 
 
 [12]
 Appellants highlight a colloquy between two senators in the legislative history, in which the chairman of the Senate Committee on Agriculture and Forestry assures another that credit would not extend to "agribusiness operations which would deliver gas and oil to farms ... because those are products, and not services." 117 Cong. Rec. 27,993 (1971). The agency notes, however, that the example cited involved a business "engaged exclusively or predominantly in the sale of goods or products rather than services" and that such businesses would not receive loans "to finance the operations relating to such sales" under the new regulations
 
 
 [13]
 Prior to the Food, Agriculture, Conservation and Trade Act of 1990, the statute required that System banks only finance processing and marketing operations of farmers contributing at least 20 percent of throughput. See S.Rep. No. 101-357, at 258; see also 12 U.S.C. § 2019(a) (1994). Congress apparently adopted this change to "provide greater flexibility to farmers and to prevent, in the future, a farmer from becoming ineligible for System financing due to the success and growth of a marketing and processing operation. The Committee specifically sets no bottom limit for what portion the on-farm production must make up of the total throughput." S.Rep. No. 101-357, at 258, 1990 U.S. Code Cong. & Admin. News at 4912. The agency contends that these changes demonstrate congressional intent to reduce the restrictions placed on lending to processors and marketers
 
 
 [14]
 Appellants rely on a senator's comments warning that "[w]e do not intend that [the provisions regarding processing and marketing] should ever be used to authorize a loan to a joint venture composed of eligible and noneligible persons if the noneligible persons exercise substantial control of the facility or activity financed by the loan." 126 Cong. Rec. 33,982 (1980). This quote, however, suggests that the senator understood that a joint venture in which noneligible persons did not exercise substantial control would be eligible for loans, thereby undercutting appellants' argument that the congressional intent mandates 100 percent control of the operation by otherwise eligible borrowers. It appears reasonable that requiring farmers to own a majority-interest in an operation is consistent with the senator's concern that joint venture operations not be substantially controlled by noneligible outsiders
 
 
 [15]
 The legislative history also supports requiring owner-occupancy as a condition of receiving credit, as both the Senate and House Reports contemplated lending to individuals residing in rural areas. See S.Rep. No. 92-307, at 5; H.R.Rep. No. 92-593, at 2